## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

BELLWETHER MUSIC FESTIVAL, LLC,   :
et al.,   :
  :    Case No. 1:20-cv-463
         Plaintiffs,   :
  :    Judge McFarland
v.   :
  :
AMY ACTON, et al.,   :
  :
         Defendants.   :

---

## DEFENDANTS AMY ACTON AND LANCE D. HIMES'
## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

DAVE YOST
Ohio Attorney General

John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
SPECIAL COUNSEL
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Telephone: 614-365-9900
Facsimile: 614-365-7900
zeiger@litohio.com
little@litohio.com

*Counsel for Defendants*
*Amy Acton and Lance D. Himes*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... iv

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ....................................................................................................4

        A.      The COVID-19 Pandemic......................................................................4

        B.      Ohio Follows CDC Guidance And Issues Stay Home Orders.................5

        C.      Ohio Begins To Turn On The "Dimmer Switch" And Commences A
                Phased Re-Opening In Order To Monitor The Spread Of COVID-19 ...................5

III.    LAW AND ANALYSIS ..........................................................................................7

        A.      Plaintiffs Cannot Prove By Clear And Convincing Evidence A
                Likelihood Of Success On The Merits...................................................7

                1.      The State's Authority To Protect The Public's Health And
                        Safety ........................................................................................7

                        A.      The Director Of The Ohio Department Of Health Has
                                The Authority To Issue Orders In Response To A
                                Deadly Pandemic To Protect Ohioans Against The
                                Threat Of COVID-19. ..................................................7

                        B.      Under The Supreme Court's Controlling Decision In
                                Jacobson, The Court Must Give Especially Broad
                                Latitude To Government Officials Responding To A
                                Public Health Emergency. ............................................9

                        C.      States May Restrict Business Operations And Large
                                Gatherings As A Means Of Preventing The Spread Of
                                COVID-19 And Protecting The Public............................9

                        D.      Ohio's COVID-19 Orders Readily Satisfy The
                                Deferential Jacobson Standard Of Review ....................12

                2.      Plaintiffs Cannot Prove By Clear And Convincing Evidence A
                        Likelihood Of Success On Their First Amendment Claim........................13

i

a. Ohio's Temporary Limitation On Festivals Is A Restriction On Economic Activity, Not A Restriction On Expression, And Is Not Subject To First Amendment Scrutiny. ..................................................................13

b. Any Incidental Impact Of The State's Temporary Prohibition On Festivals Is A Content-Neutral, Reasonable Time, Place And Manner Restriction. ........................15

i. The Prohibition On Festivals Is Content-Neutral .............15

ii. Time, Place And Manner Restrictions Are Valid If They Promote A Substantial Government Interest—Here, Fighting COVID-19—And Leave Open Alternative Avenues For Expression..........................................................................15

3. Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On Their Equal Protection Clause. ......................21

a. The State's Determination Of Which Activities Are Permitted To Resume And When During Ohio's Phased Re-Opening Is Subject To Rational Basis Review ........................21

b. Plaintiffs' Equal Protection Claim Fails Because Their Musical Festivals And Political Protests Against Police Brutality Are Not Similarly Situated .............................................22

c. Plaintiffs' "Fundamental Rights" Argument Is A Red Herring; Content-Neutral Regulations Are Reviewed Under The Rational Basis Test ......................................................24

4. Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On Their Substantive Due Process Claim..........................................................................................................26

5. Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On Their Facial Constitutional Claim .................28

B. The Other Injunction Factors Weigh Against Injunctive Relief............................29

1. Plaintiffs Do Not Face Irreparable Harm; Their Claims Are Fundamentally About Money. ..................................................................29

2.      The Harm To The Parties And The Public Interest Weigh
         Against Injunctive Relief ............................................................................30

IV.    CONCLUSION................................................................................................30

CERTIFICATE OF SERVICE .......................................................................................31

**Cases**                                                                                                                    **Page**

Albright v. Oliver, 510 U.S. 266 (1994) ......................................................................26

Aldridge v. City of Memphis, 404 F.App'x 29 (6th Cir.2010) ..................................3, 23

Altman v. County of Santa Clara, 2020 U.S. Dist. 97535 (N.D. Cal. 2020) ................11

Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758 (D. Conn. May 19, 2020) ..................10, 11, 16

Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. LEXIS 88883 (D. Md. May 20, 2020) ................................................................................................. *passim*

Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986) ......................................................14

Aristotle Publ'g v. Brown, 61 Fed. Appx. 186 (6th Cir. 2003) ....................................29

Ashwander v. TVA, 297 U.S. 288 (1936) ....................................................................28

Automaxx, Inc. v. Morales, 906 F. Supp. 394 (S.D.Tex.1995) ....................................25

Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320 (2006) ................28

Baker v. Adams County v. Ohio Valley Sch. Bd., 310 F. 3d 927 (6th Cir. 2002) ........29

Banks v. Cty. of San Mateo, 2017 U.S. Dist. LEXIS 127347 (N.D.Cal. Aug. 10, 2017) ..........................................................................................................................25

Bayley's Campground, Inc. v. Mills, 2020 U.S. Dist. Lexis 94296 (D. Me. 2020) ....................11

Benner v. Wolf, 2020 U.S. Dist. LEXIS 89425 (M.D. Pa. May 21, 2020) ....................11, 18, 20

Best Supplement Guide v. Newsom, 2020 U.S. Dist. LEXIS 90608 (E.D. Cal. 2020...............................................................................................................................11

Bonnell v. Lorenzo, 241 F. 3d 800 (6th Cir. 2001) ......................................................29

Brieger v. Telectronics, Inc., 816 F. 2d 678 (Table), 1987 U.S. App. LEXIS 5101 (6th Cir. 1987)..........................................................................................................29

Bullock v. United States, 265 F. 2d 683 (6th Cir.1959) ..............................................15

**<u>Cases</u>**                                                                                          **<u>Page</u>**

<u>Cassell v. Snyders</u>, 2020 U.S. Dist. LEXIS 77512 (N.D. Ill. May 3, 2020)...........................11, 19

<u>Charlevoix Prods., Inc. v. Cty. of Charlevoix</u>, 1990 U.S. Dist. LEXIS 11020 (W.D. Mich. Aug. 20, 1990)................................................................................................23, 24

<u>Dallas v. Stanglin</u>, 490 U.S. 19 (1989) ......................................................................14

<u>Dandridge v. Williams</u>, 397 U.S. 471 (1970) ............................................................21

<u>Diamond S.J. Ent. v. City of San Jose</u>, 430 F. Supp. 3d 637 (N.D.Cal.2019).............................14

<u>DLS, Inc. v. City of Chattanooga</u>, 107 F. 3d 403 (6th Cir.1997) ...................................25

<u>Earle v. Birmingham Bd. of Edn.</u>, 2020 U.S. Dist. LEXIS 14629 (N.D. Ala. Jan. 29, 2020) ................................................................................................................23

<u>EJS Props., LLC v. City of Toledo</u>, 698 F. 3d 845 (6th Cir. 2012).................................26

<u>Enchant Christmas Light Maze & Mkt. v. Glowco, LLC</u>, 958 F. 3d 532 (6th Cir. 2020) .............................................................................................................................29

<u>Equus Assocs. v. Town of Southampton</u>, 37 F. Supp. 2d 582 (E.D.N.Y. 1999) .........................23

<u>Field Day, LLC v. Cty. of Suffolk</u>, 463 F. 3d 167 (2d Cir. 2006) ................................16

<u>Geller v. De Blasio</u>, 2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18, 2020) ..........10, 16, 17, 18

<u>Givens v. Newsom</u>, 2020 U.S. Dist. LEXIS 81760 (E.D. Cal. May 8, 2020) .......................15, 20

<u>Guertin v. Mich.</u>, 924 F. 3d 309 (6th Cir. 2019) ........................................................27

<u>Hafoka v. Sessions</u>, 734 F. App'x 565 (10th Cir. 2018).................................................1

<u>Hartman v. Acton</u>, 2020 U.S. Dist. LEXIS 72068 (S.D. Ohio 2020) ...............................7, 11, 30

<u>Heike v. Guevara</u>, 519 Fed. Appx. 911 (6th Cir. 2013) ................................................27

<u>High Plains Harvest Church v. Polis</u>, 2020 U.S. Dist. LEXIS 105247 (D. Colo. June 16, 2020) .............................................................................................................23

<u>In re Abbott</u>, 954 F. 3d 772 (5th Cir. 2020)...............................................................10

<u>In re Abbott</u>, 2020 U.S. App. LEXIS 12616 (5th Cir. Apr. 20, 2020) .........................11

**Cases**                                                                                                          **Page**

In re Rutledge, 2020 U.S. App. LEXIS 12893 (8th Cir. 2020)  ....................................................11

Jacobson v. Massachusetts, 197 U.S. 11 (1905) ...................................................................... *passim*

Jolivette v. Husted, 694 F. 3d 760 (6th Cir.2012) ........................................................................23

Kaahumanu v. Hawaii, 682 F. 3d 789 (9th Cir.2012) ..................................................................25

Kiser v. Kamdar, 831 F. 3d 784 (6th Cir. 2016) ..........................................................................26

Lawrence v. Colorado, 2020 U.S. Dist. LEXIS 92910 (D. Colo. 2020) .......................................11

Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415 (D. N.Mex. 2020) ...............11, 19

Lewellen v. Metro. Gov't of Nashville & Davidson County, Tenn., 34 F. 3d 345
(6th Cir. 1993).................................................................................................................................27

Lewis v. City of Union City, 918 F. 3d 1213 (11th Cir.2019) ......................................................23

Lighthouse Fellowship Church v. Northam, 2020 U.S. Dist. LEXIS 80289 (E.D.
Va. May 1, 2020) ...........................................................................................................................18

Maldonado v. Morales, 556 F. 3d 1037 (9th Cir. 2009) ...............................................................25

Marcavage v. City of New York, 918 F. Supp. 2d 266 (S.D.N.Y. 2013) .....................................25

Matz v. J.L. Curtis Cartage Co., 132 Ohio St. 271 (1937)............................................................8

McGuire v. Reilly, 260 F. 3d 36 (1st Cir. 2001) ..........................................................................25

Monumental Task Commt., Inc. v. Foxx, 157 F. Supp. 3d 573 (E.D. La. 2016) ...........................1

Mysak v. City of New York, S.D.N.Y. No. 17-CV-3340 (JPO), 2019 U.S. Dist.
LEXIS 52842 (Mar. 28, 2019) ......................................................................................................14

Nat'l Viatical Inc., v. Universal Settlements, Int'l, 716 F. 3d 952 (6th Cir. 2013) ......................29

Open Our Oregon v. Brown, 2020 U.S. Dist. 87942 ....................................................................10

Prado v. Thomas, 2020 U.S. App. LEXIS 5381 (6th Cir. Feb. 20, 2020) ....................................23

Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015) ..................................................................15

**Cases**                                                                                          **Page**

S. Bay United Pentecostal v. Newsom, __ U.S. __, 2020 U.S. Lexis 3041 (2020)....................1, 9

Sabri v. United States, 541 U.S. 600 (2004)..................................................................28

Santa Monica Nativity Scenes Comm. v. City of Santa Monica, 784 F. 3d 1286
(9th Cir. 2015)..............................................................................................15

Schroder v. City of Fort Thomas, 412 F. 3d 724 (6th Cir. 2005) ..................................27

Sean McCarthy & 53 Veterans Hwy. v. Cuomo, 2020 U.S. Dist. LEXIS 107195
(E.D.N.Y. June 18, 2020) ...............................................................................16

Sh3 Health Consulting v. St. Louis County Exec., 2020 U.S. Dist. LEXIS 81433
(E.D. Mo. 2020) ..........................................................................................12

Shows v. Swain County, 2020 U.S. Dist. Lexis 71669 (W.D. N.C. 2020) ..................................12

Sorrell v. IMS Health Inc., 564 U.S. 552 (2011) ...........................................................13

South Bay United Pentecostal Church v. Newsom, 2020 U.S. App. LEXIS 16494
(9th Cir. May 22, 2020) .............................................................................9, 11, 21

Talleywhacker, Inc. v. Cooper, 2020 U.S. Dist. LEXIS 99905 (E.D.N.C. June 8,
2020) .............................................................................................. *passim*

Taxi Cabvertising, Inc. v. City of Myrtle Beach, 26 F.App'x 206 (4th Cir.2002) ......................25

Thinh Tran v. Dept. of Planning, 2020 U.S. Dist. LEXIS 103461 (D. Haw. June
12, 2020) ..................................................................................................13

Tree of Life Christian Schools v. City of Upper Arlington, 905 F. 3d 357 (6th Cir.
2018) ......................................................................................................23

United States. v. Salerno, 481 U.S. 739 (1987) ...........................................................28

Utahns for Better Transp. v. United States DOT, 180 F. Supp. 2d 1286 (D. Utah
2001) .......................................................................................................1

Washington State Grange v. Washington State Republican Party, 552 U.S. 442
(2008)......................................................................................................28

| **Statutes** | **Page** |
|---|---|

R.C. 3701.03(A)............................................................................................................8

R.C. 3701.13 ...............................................................................................................8

R.C. 3701.14 ...............................................................................................................8

**I.**                    **INTRODUCTION**

> *"[I]f one disagrees with the policy choices made, recourse is not to the courts, which can do nothing about policy choices. Recourse, if any, is to the ballot box."*
>
> [<u>Utahns for Better Transp. v. United States DOT</u>, 180 F. Supp. 2d 1286, 1293 (D. Utah 2001) (emphasis added).]

Plaintiffs are in the wrong forum. Their attacks are simply partisan, personal opposition to the steps the State of Ohio has taken to protect its citizens from the onslaught of the COVID-19 pandemic. "When we strip away the rhetoric here, what's left is a quarrel over the [State of Ohio's] exercise of discretion" and power to protect the public's health. <u>Hafoka v. Sessions</u>, 734 F. App'x 565, 570 (10th Cir. 2018).[1]

The courtroom is not the proper forum to debate social and health policy pronouncements by elected officials, particularly on matters of public safety and health. As Chief Justice Roberts put it, the latitude afforded to government officials responding to COVID-19 "must be especially broad" and "should not be subject to second-guessing by an 'unelected' federal judiciary, which lacks the background, competence and expertise to assess public health." <u>S. Bay United Pentecostal v. Newsom</u>, __ U.S. __, 2020 U.S. Lexis 3041 (2020). Indeed, the Supreme Court has long held that States have broad powers to protect their citizens in the face of public health emergencies. <u>See</u> <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905). <u>Jacobson</u> teaches us that judicial review of state measures responding to a health crisis is very limited, and courts must not intervene except when a measure "has no real or substantial relation to" the object of protecting "the public health, the public morals, or the public safety," or is "beyond all question, a plain,

---

[1]      <u>See also</u> <u>Monumental Task Commt., Inc. v. Foxx</u>, 157 F. Supp. 3d 573, 603 (E.D. La. 2016) ("Plaintiffs have established only that they disagree with the City's action, not that the City abused its power. This Court, however, has nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts.") (emphasis added).

palpable invasion of rights secured by the fundamental law." Id. at 31. Courts across the country have followed Jacobson and afforded deference to state measures aimed at combatting the spread of COVID-19.

Despite this Supreme Court precedent, Plaintiffs challenge public health orders issued by the Director of the ODH to prevent the spread of COVID-19 and urge this Court to second guess Ohio's decision to conduct a phased re-opening of the State following the recent stay-at-home orders. Because these are truly uncharted waters and the public health concerns strongly persist, the State is taking a step-by-step approach to resuming pre-COVID life so that, among other reasons, the State may monitor the impact of increased activity on the spread of this pandemic that has already claimed the lives of more than 100,000 Americans, including approximately 2,500 Ohioans. Rather than "flipping the light switch back on" and allow all activities to resume at once, Ohio is taking a "dimmer switch" approach that re-opens the state in stages.

Plaintiffs take specific issue with Ohio's decision to allow certain activities to resume while not yet giving the green light to festivals—such as Plaintiffs' multi-day Country Fest music festival, a three-day music and camping extravaganza that historically has attracted tens of thousands of attendees from multi-states. If a picture is worth a thousand words, then the "official" video available of a past Country Fest musical festivals offer a public health treatise outlining this high-risk event, the health dangers for their patrons, and the reasonableness of the Ohio's conduct: https://vimeo.com/275444995. Other videos will be offered at the hearing.

Plaintiffs' claims are completely without merit. First, applying the Jacobson standard, Ohio's staged re-opening process is reasonable. The recent decision in Talleywhacker, Inc. v. Cooper, 2020 U.S. Dist. LEXIS 99905, at *25-26 (E.D.N.C. June 8, 2020) is on point. There the plaintiffs brought an Equal Protection claim challenging the state's phased re-opening orders

following COVID-19 shutdowns.  The court first held that an Equal Protection claim challenging which activities were permitted to re-open and which activities were not was subject to the rational basis test. Id.  Under this deferential standard, "the law is *presumed to be valid* and *will be sustained* if the classification drawn by the statute is rationally related to a legitimate state interest.  Furthermore, *those attacking the rationality of the [law] have the burden to negat[e] every conceivable basis which might support it*.  In other words, where there are plausible reasons for the rule, [the court's] inquiry is at an end."  Id. at *25-26 (emphasis added).[2]

The Talleywhacker court went on to hold that the state's phased re-opening approach readily satisfied this deferential standard:

> While plaintiffs effectively point out similarities between their businesses and those allowed to reopen, *a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect*. Indeed, [i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.  … [D]efendant employed a '*dimmer switch*' approach to the reopening of businesses, *gradually easing restrictions on high-risk activities, instead of allowing all businesses to reopen at once*, in order to monitor the spread of COVID-19. This measured approach *is reasonable and rational*, where uncertainties about COVID-19 still loom.

> [Id. at *28-29 (quotations, citations omitted; emphasis added).]

The same result attains here:  Ohio's "dimmer approach" is reasonable and rationale in light of the looming COVID-19 concerns.  We add that even if the deferential standard under Jacobson did not apply, Plaintiff's shot-gun blast of constitutional claims still fail on both legal and factual grounds, as is explained below in detail.  Plaintiffs' motion should be denied.

---

[2]    See also Aldridge v. City of Memphis, 404 F.App'x 29, 43 (6th Cir.2010) ("Under rational-basis review, a defendant has no obligation to produce evidence to sustain the rationality of its action; *its choice is presumptively valid* and may be based on rational speculation unsupported by evidence or empirical data.") (quotation, citation omitted, emphasis added).

II.                                **BACKGROUND**

    A.    **The COVID-19 Pandemic.**

Given that the Court will conduct an evidentiary hearing on this matter, Defendants provide the following abbreviated background statement.   COVID-19 is a respiratory disease that can result in serious illness or death, and is caused by the SARS-CoV-2 virus.  [Stay Home Order, Ex. C to Compl., R. 1-3, PageID# 59.]  SARS-CoV-2 is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person.  [Id.; https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.]  It is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs, sneezes, or talks.  [Id.] COVID-19 may be spread by people who are not showing symptoms of the disease.  [Id.]  It may also be possible for the virus to be spread by a person touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes.  [Id.]

On January 31, 2020, the United States Health and Human Services Secretary declared a public health emergency for the United States in response to COVID-19.  [R. 1-3, PageID# 59] On March 9, 2020, the Governor declared a State of Emergency in Ohio.  [Exec. Order 2020-01D, R. 1-1, PageID# 41.]  On March 11, 2020, the World Health Organization officially declared COVID-19 to be a pandemic (a global outbreak of disease).  [R. 1-3, PageID# 60.]

The CDC and the President of the United States advised that people should avoid gathering in groups of more than ten people, and recommended closing "indoor and outdoor venues where groups of people congregate."  [See The President's Coronavirus Guidelines for America, *30 Days to Slow the Spread*, (March 31, 2020) www.whitehouse.gov/wp-content/up-loads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315pm.pdf.]

### B.    Ohio Follows CDC Guidance And Issues Stay Home Orders.

Consistent with federal guidance, the Ohio Department of Health ("ODH") has issued multiple orders to mitigate the spread of COVID-19.  The Director first prohibited gatherings of more than 50 people, and then prohibited gatherings of more than ten people, consistent with CDC recommendations.  [Compl. Ex. C, R. 1-2, PageID# 45; Stay Home Order ¶ 3, R.1-3, PageID# 50]  ODH issued several orders in response to the pandemic.  Among other things, ODH required schools to close temporarily; required businesses deemed nonessential to close temporarily; and required essential business that remained open to operate with certain safety precautions to protect the health of the employees and customers and, ultimately, the public (by reducing the spread of the virus).  https://coronavirus.ohio.gov/wps/portal/gov/covid-19/resources/public-health-orders/public-health-orders.

President Trump issued Guidelines for Opening Up American Again, which recommend a phased approach based upon the advice of public health experts and various indicators of the severity of the outbreak in a particular State.  https://www.whitehouse.gov/openingamerica/. The CDC has similarly provided guidelines to State health departments, businesses, and individuals to mitigate the spread of COVID-19.  https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/community-mitigation.html.  Specialized guidance is provided for various types of settings, such as day care centers, offices, etc.  Id.

### C.    Ohio Begins To Turn On The "Dimmer Switch" And Commences A Phased Re-Opening In Order To Monitor The Spread Of COVID-19.

Over the past month or so, Ohio began lifting restrictions on various businesses, in a phased approach.  For example, restrictions on manufacturing and retail businesses and office environments were lifted on May 4, 2020; hair salons and barber shops were permitted to open on May 15, 2020; restaurants were permitted to provide indoor dining on May 21; gyms and

fitness centers were permitted to open on May 26, 2020; child care centers were permitted to open on May 29, 2020; and youth day camps and residential camps were permitted to open on June 1, 2020. https://coronavirus.ohio.gov/wps/portal/gov/covid-19/resources/public-health-orders/public-health-orders. The Stay Safe Order was updated and extended, but certain portions, including the requirement for individuals to stay home, have been rescinded. https://coronavirus.ohio.gov/static/publicorders/revised-business-guidance-sd.pdf; https://coronavirus.ohio.gov/static/publicorders/Stay-Safe-Partial-Rescission.pdf.

The CDC has advised that the "highest risk" of transmission for COVID-19 exists for "[l]arge in-person gatherings where it is difficult for individuals to remain spaced at least 6 feet apart and attendees travel from outside the local area." [Id.] The CDC has advised that, "[t]he *more people* an individual interacts with at a gathering and the longer that interaction lasts, the higher the potential risk of becoming infected with COVID-19 and COVID-19 spreading." https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html (emphasis in original).

Here, Plaintiffs seek to hold an event in Ohio that clearly falls within the highest risk category for public gatherings. Newspaper reports indicate that in 2015, over 50,000 people attended The Country Fest. http://clevelandcountrymagazine.com/the-country-fest-is-becoming-a-summer-tradition/. In Count I of the Complaint, Plaintiffs allege a violation of their First Amendment rights to freedom of speech and assembly. Count II is difficult to discern. It is titled, "Violation of Right to Free Speech (42 U.S.C. § 1983/Fourteenth Amendments – Due Process)," but alleges that the Director of ODH violated "the innate rights of personal and individual liberty of Plaintiffs, as well as such rights of others who would otherwise associate and interact with Plaintiffs." Count III alleges that the Director discriminated against Plaintiffs'

planned mass gatherings, while allowing others to engage in mass gatherings. Plaintiffs assert all

claims as both facial and as-applied challenges to Ohio's public health orders.[3]

III.                                    **LAW AND ANALYSIS**

    A.    **Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On The Merits.**

For the reasons explained below, each of these claims is without merit and Plaintiffs are

not entitled to the extraordinary relief they seek.[4]

    1.    **The State's Authority To Protect The Public's Health And Safety.**

        a.    **The Director Of The Ohio Department Of Health Has The Authority To Issue Orders In Response To A Deadly Pandemic To Protect Ohioans Against The Threat Of COVID-19.**

In these emergency times, with the State (and the world) facing a deadly pandemic unlike

any public health crisis experienced in recent memory, the State has the power, and most would

argue the obligation, to issue public health orders to protect the lives of Ohioans from COVID-

19. The police power reserved to the States under the Tenth Amendment of the United States

Constitution includes the authority to enact laws and implement measures that "protect the public

health and the public safety." Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905). This is true in

normal times, and it is particularly true in times of a public health emergency:

---

[3]    Further highlighting the inappropriateness of this action, Plaintiffs do not merely ask this Court to order that they be allowed to hold their festivals; rather, they seek an injunction preventing ODH from restricting the festivals "*in any manner.*" [Compl., R. 1, PageID# 38, 39) (emphasis added)] So, Plaintiffs want free reign in a pandemic to bring tens of thousands of people to congregate in one area for three straight days without any restrictions. People presumably will be waiting in line to enter, waiting in line for food or drinks, waiting in line to use portable toilets, sitting or standing next to each other, yelling, singing and dancing while they listen to performers. Visitors to the festivals will be purchasing and consuming food and drinks (including alcohol), using portable toilets and camping for three days, including camping in tents in open primitive sites without water hookup.

[4]    Plaintiffs seek an order precluding ODH from enforcing its orders against all "parades, fairs, festivals, and carnivals." (Comp., R. 1, PageID# 38.) Plaintiffs also ask the court to order that ODH not "impede or threaten any vendors who provide support for such festivals and events" and assert claims on behalf of themselves "as well as such rights of others who would otherwise associate and interact with Plaintiffs." (Compl. ¶ 177, R. 1.) The Court lacks jurisdiction to issue a preliminary injunction regarding ODH's handling of any other entities. See Hartman v. Acton, No. 2:20-CV-1952, 2020 U.S. Dist. LEXIS 72068, at *6-7 (S.D. Ohio Apr. 21, 2020) (bridal shop owner lacked standing to challenge Ohio's COVID-19 orders on behalf of other Ohio businesses).

The authority to determine for all what ought to be done in such an emergency must have been lodged somewhere or in some body…. To invest [a local board of health] with authority over such matters was not an unusual nor an unreasonable or arbitrary requirement. *Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members.*

[Id. at 27 (emphasis added).]

The State of Ohio has lodged this authority—to "protect itself against an epidemic of disease"—with the Director of the Ohio Department of Health. Since the Department's creation in 1886, the General Assembly has granted the Department of Health and its Director specific authority over quarantine and isolation. See S.B. 90 of the 67th General Assembly. The General Assembly authorized the Department of Health to exercise "supervision of all matters relating to the preservation of the life and health of the people" of Ohio. R.C. 3701.13. Under this duly delegated authority,[5] the Director has the power to enact special or standing orders or rules to prevent the spread of contagious or infectious diseases including the power to declare and enforce quarantine and isolation restrictions. R.C. 3701.13; see also R.C. 3701.03(A) (conferring authority upon the Director to "perform duties that are incident to the director's position as chief executive officer of the department of health," which include administering "the laws relating to health and sanitation and the rules of the department of health."). Further, R.C. 3701.14 imposes a mandatory duty: "[t]he director of health *shall* investigate or make inquiry as to the cause of disease or illness, including contagious, infectious, epidemic, *pandemic*, or endemic conditions, and *take prompt action to control and suppress it*." (Emphasis added.)

Ohio's COVID-19 stay-at-home orders and its phased lifting of their restrictions are therefore a valid exercise of the State's police power.

---

[5]    While the Ohio Constitution vests the State's legislative authority in the General Assembly, the General Assembly may delegate discretionary power to a state officer, without establishing standards for the exercise of discretion, "for the protection of the public morals, *health*, *safety* or *general welfare*,  and [where] it is impossible or impracticable to provide such standards." Matz v. J.L. Curtis Cartage Co., 132 Ohio St. 271, 272 (1937).

**b.**    **Under The Supreme Court's Controlling Decision In <u>Jacobson</u>, The Court Must Give Especially Broad Latitude To The State's Response To A Public Health Emergency.**

The Supreme Court has long held that a State's exercise of its police powers in the face of a public health emergency is subject to *limited* judicial review—*even where otherwise protected constitutional rights are impacted*—and such emergency measures must be upheld unless they have "no real or substantial relation" to protecting public health and impose "beyond all question, a plain palpable invasion of rights secured by the fundamental law." <u>Jacobson</u>, 197 U.S. at 31.

While <u>Jacobson</u> was decided over a century ago, it applies today with equal force. Just weeks ago, Chief Justice Roberts cited <u>Jacobson</u> and underscored the latitude that courts must afford to government officials responding to the COVID-19 pandemic when he concurred in denying an application for an injunction pending appeal in a case involving limitations on church services. <u>S. Bay United Pentecostal v. Newsom</u>, __ U.S. __, 2020 U.S. Lexis 3041 (2020). He observed that, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and concluded that the latitude afforded to government officials "must be *especially broad*" and "should not be subject to second-guessing by an 'unelected' federal judiciary, which lacks the background, competence and expertise to assess public health." <u>South Bay,</u> 2020 U.S. LEXIS 3041, at *2-3 (emphasis added; quotation omitted).

**c.**    **States May Restrict Business Operations And Large Gatherings As A Means Of Preventing The Spread Of COVID-19 And Protecting The Public.**

Chief Justice Roberts is hardly alone in relying on <u>Jacobson</u> to uphold public health orders targeted at limiting the spread of COVID-19. Indeed, there has been a "chorus of other

federal courts … pointing to <u>Jacobson</u> and rejecting similar constitutional claims[.]"  <u>Open Our</u> <u>Oregon v. Brown</u>, 2020 U.S. Dist. 87942, *5-6 (denying preliminary injunction to numerous businesses, including taverns and tattoo parlors).  <u>See</u>, <u>e.g.</u>, <u>Amato v. Elicker</u>, 2020 U.S. Dist. LEXIS 87758, at *28-29 (D. Conn. May 19, 2020) ("<u>Jacobson </u>requires that courts refrain from second-guessing state governments' responses [to COVID-19] unless there is 'no real or substantial relation' between the actions and the public health and safety or the action is 'beyond all question, a plain, palpable invasion of rights.'") (quoting <u>Jacobson</u>); <u>Geller v. De Blasio</u>, 2020 U.S. Dist. LEXIS 87405, at *7-8 (S.D.N.Y. May 18, 2020) ("Over a century ago, the U.S. Supreme Court taught that 'a community has the right to protect itself against an epidemic of disease which threatens its members.'  In such times, judicial scrutiny is reserved for a measure that 'has no real or substantial relation to' the object of protecting 'the public health, the public morals, or the public safety,' or is 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' As explained by the Supreme Court, a 'court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case.'") (quoting <u>Jacobson</u>, citations omitted).

<u>Jacobson </u>is thus "the controlling Supreme Court precedent that squarely governs judicial review of rights-challenges to public health measures."  <u>In re Abbott</u>, 954 F. 3d 772, 785 (5th Cir. 2020).  Under <u>Jacobson</u>, a court's power is <u>*limited*</u> to asking whether the State action during a public health crisis is taken in "an arbitrary, unreasonable manner" or through "arbitrary and oppressive regulations."  <u>Abbott, </u>954 F. 3d at 784 (quoting <u>Jacobson</u>, 197 U.S. at 28, 38). While

courts should ask if the measures provide exceptions for extreme cases, they should not "second-guess the wisdom or efficacy of the measures." Id. at 785.[6]

Thus, "*the traditional tiers of constitutional scrutiny do not apply.*" Cassell v. Snyders, 2020 U.S. Dist. LEXIS 77512, *17 (N.D. Ill. May 3, 2020) (emphasis added). Judicial review is limited under Jacobson even when fundamental rights are implicated, "*including First Amendment rights.*" Amato, at *28-29 (emphasis added). See also Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415, *98 (D. N.Mex. 2020) (applying Jacobson in case relating to religious services); In re Abbott, 2020 U.S. App. LEXIS 12616, *34-36 (5th Cir. Apr. 20, 2020) (applying Jacobson in case relating to abortion procedures); In re Rutledge, 2020 U.S. App. LEXIS 12893, *21-22 (8th Cir. 2020) (applying Jacobson in case relating to abortion procedures); South Bay United Pentecostal Church v. Newsom, 2020 U.S. App. LEXIS 16494, *3 (9th Cir. May 22, 2020) (applying Jacobson in case relating to abortion procedures).

Following these principles, courts across the country rejected similar challenges to COVID-19 limitations on business activities and gatherings, including Chief Judge Marbley's decision in Hartman, 2020 U.S. Dist. 72068 (S.D. Ohio) (denying TRO to bridal shop). See also Altman v. County of Santa Clara, 2020 U.S. Dist. 97535 (N.D. Cal. 2020) (denying preliminary injunction to firearm retailer); Bayley's Campground, Inc. v. Mills, 2020 U.S. Dist. Lexis 94296 (D. Me. 2020) (denying preliminary injunction to campgrounds and lodging); Best Supplement Guide v. Newsom, 2020 U.S. Dist. LEXIS 90608 (E.D. Cal. 2020) (denying TRO to gym); Benner v. Wolf, 2020 U.S. Dist. LEXIS 89425 (M.D. Pa. 2020) (denying TRO to business owners and political candidates); Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. Lexis

---

[6]     We note that several courts have held, even under this relaxed standard of review, that slowing the spread of COVID-19 is a "*compelling interest.*" Cassell v. Snyders, 2020 U.S. Dist. LEXIS 77512, at *34 (N.D. Ill. 2020) (emphasis added); Antietam Battlefield KOA, 2020 U.S. Dist. Lexis at *33-34; Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415, at *117 (D. N.M. 2020); Lawrence v. Colorado, 2020 U.S. Dist. LEXIS 92910, at *23 (D. Colo. 2020).

8883 (Dist. Md. 2020) (denying TRO and preliminary injunction to numerous parties including a campground and an "adventure park"); <u>Shows v. Swain County, 2</u>020 U.S. Dist. Lexis 71669 (W.D. N.C. 2020) (denying TRO to individual challenging curfew imposed on non-essential businesses); <u>Sh3 Health Consulting v. St. Louis County Exec.,</u> 2020 U.S. Dist. LEXIS 81433 (E.D. Mo. 2020) (denying TRO to gym and antique store).

> ### d.    Ohio's COVID-19 Orders Readily Satisfy The Deferential <u>Jacobson</u> Standard of Review.

When viewed through the <u>Jacobson</u> lens, it is clear that Plaintiffs' claims fail as a matter of law.  Plaintiffs cannot show that temporarily prohibiting a business from holding festivals has "no real or substantial relationship" to the State's compelling interest in protecting Ohioans from the dire health consequences and death caused by COVID-19.

Quite simply, the Director's orders were issued to decrease the spread of a deadly disease that is transmitted by human contact, and the orders prohibiting festivals reduce human contact thereby reducing the risk for transmission of COVID-19.  The CDC has advised that gatherings with large numbers of people for extended periods of time creates a high risk of transmitting COVID-19.  In addition to simply gathering together, the festivals planned here, like many festivals, involve live concerts with extremely large audiences that draw people from outside the local area.  Plaintiffs downplay the danger, but over 100,000 Americans have already died from COVID-19 since February of 2020.[7]  As Ohio re-opens on a step-by-step basis, ODH's decision to defer festivals to later in the re-opening process is sound as festivals present high risk of COVID-19 transmission.

---

[7]      Among the victims of COVID-19 is one of the singers who had been scheduled to perform at the Country Fest who died just days after announcing that he had been diagnosed with COVID-19.https://www.thecountryfest.com/news/postponement-statement; https://www.npr.org/2020/03/30/823841263/joe-diffie-wry-country-traditionalist-dead-at-61-following-covid-19-diagnosis.

Ohio's temporary prohibition on festivals thus has an obvious "real and substantial relationship" to public health. This Court should join the "chorus of other federal courts … pointing to <u>Jacobson</u> and rejecting similar constitutional claims," and should deny Plaintiffs' motion for this reason alone.

        **2.**        **Plaintiffs Cannot Prove By Clear and Convincing Evidence A Likelihood of Success on Their First Amendment Claim.**

But even if the deferential <u>Jacobson</u> standard did not apply, Plaintiffs would nonetheless not be entitled to relief on any of their constitutional claims. Plaintiffs' First Amendment claims fail for multiple reasons. First, the temporary prohibition on festivals is a regulation on commerce, not expression, and thus the First Amendment is not even implicated. Yet even if it were, the festival restriction is a valid content-neutral time, place and manner restriction aimed at achieving an important government interest—stopping the spread of COVID-19—that leaves open alternative avenues of expression.

        **a.**        **Ohio's Temporary Limitation On Festivals Is A Restriction On Economic Activity, Not A Restriction On Expression, And Is Not Subject To First Amendment Scrutiny.**

At the outset, we note that the restriction on festivals is not a restriction on speech *at all*. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552, 567 (2011) "*<u>The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech</u>*." <u>Id.</u> (emphasis added); <u>Thinh Tran v. Dept. of Planning</u>, 2020 U.S. Dist. LEXIS 103461, at *24 (D. Haw. June 12, 2020) ("That an incidental impact on speech might result does not subject Ordinance 3941 to scrutiny under the First Amendment.").

In <u>Dallas v. Stanglin</u>, 490 U.S. 19, 25 (1989), for example, the Supreme Court held that "the activity of … dance-hall patrons – coming together to engage in recreational dancing – is not protected by the First Amendment." In reaching this conclusion, the Court emphasized that the First Amendment is not implicated by every law that could conceivably impact expression:

> It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.

The mere fact that protected expression could occur at a festival does not subject a prohibition on festivals to First Amendment scrutiny. See <u>Arcara v. Cloud Books, Inc.</u>, 478 U.S. 697, 705 (1986) ("[N]either the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities. If the city imposed closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment, the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist."); <u>Diamond S.J. Ent. v. City of San Jose</u>, 430 F. Supp. 3d 637, 649 (N.D.Cal.2019) (permitting scheme did not implicate First Amendment even though it applied to businesses where dancing, singing, audience participation in the entertainment, or live entertainment occurred); <u>Mysak v. City of New York</u>, S.D.N.Y. No. 17-CV-3340 (JPO), 2019 U.S. Dist. LEXIS 52842, at *8 (Mar. 28, 2019) ("'[E]very civil and criminal remedy imposes some conceivable burden on First Amendment protected activities.'… But that does not mean that each such sanction under a law is subject to First Amendment scrutiny….") (quoting <u>Arcara</u>).

As in these cases, Plaintiffs' First Amendment claim fails because the temporary prohibition on festivals restricts conduct, not expression.

b.  **Any Incidental Impact Of The State's Temporary Prohibition On Festivals Is A Content-Neutral, Reasonable Time, Place And Manner Restriction.**

i.  **The Prohibition On Festivals Is Content-Neutral.**

However, even if the First Amendment were implicated, it must be remembered that the First Amendment freedom of expression is "not absolute," Bullock v. United States, 265 F. 2d 683, 694 (6th Cir.1959). This is particularly true when it comes to content-neutral governmental restrictions. While a speech restriction is content-based when it "applies to particular speech because of the topic discussed or the idea or message expressed," Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015), a restriction applicable to all speakers, regardless of their message, is content-neutral. See Givens v. Newsom, 2020 U.S. Dist. LEXIS 81760, at *14 (E.D. Cal. May 8, 2020) ("By definition, blanket bans applicable to all speakers are content-neutral.") (quoting Santa Monica Nativity Scenes Comm. v. City of Santa Monica, 784 F. 3d 1286, 1295 n.5 (9th Cir. 2015)). In other words, "content-neutral' speech restrictions [are] those that 'are justified without reference to the content of the regulated speech.'" Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. LEXIS 88883, at *26-27 (D. Md. May 20, 2020) (quotation omitted).

The orders here are content-neutral because they bar all festivals, not merely those involving country musical performances or festivals involving any particular anticipated expression based upon its content.

ii.  **Time, Place And Manner Restrictions Are Valid If They Promote A Substantial Government Interest—Here, Fighting COVID-19—And Leave Open Alternative Avenues For Expression.**

As a result, Ohio's decision to allow other activities to resume before festivals is, at worst, a "time, place and manner" restriction that must be upheld if it is "justified without reference to the content of the regulated speech, … [is] narrowly tailored to serve a significant

governmental interest, and … leave[s] open ample alternative channels for communication of the information." Field Day, LLC v. Cty. of Suffolk, 463 F. 3d 167, 174 (2d Cir. 2006) (rejecting concert festival's challenge to mass gathering statute). See Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. LEXIS 88883, at *26 (D. Md. May 20, 2020) ("The prohibition on large gatherings of individuals for the duration of the [COVID] public health crisis is more akin to a time, place, and manner restriction"); Sean McCarthy & 53 Veterans Hwy. v. Cuomo, 2020 U.S. Dist. LEXIS 107195, at *11 (E.D.N.Y. June 18, 2020) ("The COVID-19 Executive Orders are content neutral…. [T]hey broadly prohibit large gatherings, without any regard for the content of the expression occurring at those gatherings.").

At first blush, the "narrowly tailored" language may seem to indicate an exacting level of scrutiny. Not so. In order to satisfy the "narrowly tailored" requirement, "[t]he government is not required to show that a content-neutral regulation of the time, place, or manner of expression is the least restrictive or least intrusive means of achieving its state interest[;] [but] [r]ather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, at *35 (D. Conn. May 19, 2020) (rejecting First Amendment challenge to COVID order). Stated differently, "[t]he narrow tailoring requirement is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." Geller v. De Blasio, 2020 U.S. Dist. LEXIS 87405, at *9-10 (May 18, 2020). Unsurprisingly, "[r]educing the spread of COVID-19 is a legitimate and substantial government interest." Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. LEXIS 88883, at *29 (D. Md. May 20, 2020) (rejecting challenge to COVID order).

This case bears close resemblance to <u>Geller v. De Blasio</u>, 2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18, 2020) in which the court rejected a challenge to New York City's prohibition on non-essential gatherings of any size aimed at preventing the spread of COVID-19. The plaintiff in <u>Geller</u> asserted that this mass gathering ban infringed her First Amendment rights as it prohibited her from gathering with others to protest.

The <u>Geller</u> court first observed that the order in question was content neutral:

> The March 25 Executive Order is content-neutral. It bans "any non-essential gathering of individuals of any size for any reason." It does not target the contents of the speech itself or the listener's agreement or disagreement with those contents. Instead, it targets the harmful secondary effects of public gathering -- *the spread of a novel virus* for which there currently is no cure or effective treatment.

> [<u>Id.</u> at *10 (emphasis added).]

Despite the sweeping scope of New York City's ban on gatherings of any size, the ban easily passed the intermediate scrutiny level of review applicable to "time, place and manner" restrictions:

> Given the severity of the public health crisis, the City has taken measures that are *reasonable* and narrowly tailored in temporarily prohibiting public gatherings. While a measure restricting all public group activity may not likely be found narrowly tailored in ordinary times, *these times are extraordinary*. The City has demonstrated that the scientific and medical communities believe that preventing in-person gatherings is crucial to any strategy of containment. *As the City has argued, the declining rates of infection and death among New Yorkers is evidence not that the gatherings ban is overly broad, but rather that it is effective*.

> [<u>Id.</u> at *10-11 (emphasis added).]

Similarly, in <u>Talleywhacker v. Cooper</u>, 2020 U.S. Dist. LEXIS 99905, * 28 (E.D.N.C. June 8, 2020), the court rejected the plaintiffs' challenges to COVID-19 public health orders that prevented the opening of entertainment facilities, while allowing restaurants and certain other businesses to open. <u>Id.</u> at *27. The court held that even though behavior at entertainment venues

involved yelling over loud music, singing, and dancing, orders barring entertainment venues from operating did not violate the First Amendment. Id. at *28, 35-37. As in Geller, the Talleywhacker court found that the public health order was content neutral because it sought to prevent the spread of COVID-19, a purpose unrelated to speech and was subject to intermediate scrutiny. Id. at *37. And similar to Geller, the Talleywhacker court held that the order was narrowly tailored because the government interest in preventing the spread of COVID-19 would be less effective if the entertainment facilities were allowed to re-open. Id. at 38.

Geller and Talleywhacker are just two of several decisions rejecting First Amendment challenges to COVID-19 limitations on gatherings. See also Antietam Battlefield KOA v. Hogan, 2020 U.S. Dist. LEXIS 88883, *29 (D. Md. May 20, 2020) ("Reducing the spread of COVID-19 is a legitimate and substantial government interest. Additionally, the prohibition on gatherings larger than ten people promotes a substantial government interest that would be achieved less effectively absent the regulation. Because of the ease with which COVID-19 spreads, and because asymptomatic individuals may spread the virus, a gathering larger than ten people poses an increased risk that more people will get the virus if one of the attendees has it."); Lighthouse Fellowship Church v. Northam, 2020 U.S. Dist. LEXIS 80289, at *39 (E.D. Va. May 1, 2020) ("The substantial interest in slowing the spread of this highly contagious virus and saving human life would be achieved less effectively if more people than necessary are permitted to gather in groups larger than ten."); Benner v. Wolf, 2020 U.S. Dist. LEXIS 89425, *19-20 (M.D. Pa. May 21, 2020) ("Protecting lives is among the most substantial of government interests, and we see no indication whatsoever that the Orders are content-based. They apply

equally to all citizens of Pennsylvania and to a great number of non-life sustaining businesses, regardless of message.").[8]

Here, Plaintiffs do not even allege that the Director's orders were adopted in order to quell free speech. Nor could they because the orders are based on protecting public health. The Stay Safe expressly states its intent:

> The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements.

[Stay Safe Order, ¶ 17, R. 1-5, PageID# 92.]

Here, the temporary ban on festivals is justified entirely by the non-expressive aspects of festivals—large crowds of people engaging in numerous human interactions and spending lengthy amounts of time in close proximity to one another—that place attendees at substantial risk for contracting and spreading the virus among fellow attendees who will then be at risk for spreading the virus to additional attendees and non-attendees with whom they come in contact following the festival. The CDC has advised that, "[t]he *more people* an individual interacts with at a gathering and the longer that interaction lasts, the higher the potential risk of becoming infected with COVID-19 and COVID-19 spreading." https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html (emphasis in original).

---

[8]     Some federal courts have held that restrictions on large gatherings satisfy even strict scrutiny. See Antietam, 2020 U.S. Dist. LEXIS 88883, at *35; Cassell v. Snyders, 2020 U.S. Dist. LEXIS 77512, * 31, 37 (N.D. Ill. May 3, 2020); Legacy Church, 2020 U.S. Dist. LEXIS 68415, at *122. It is well established that the government has a compelling interest in reducing the spread of COVID-19. Courts have held that restrictions on large gatherings satisfy strict scrutiny because less restrictive alternatives would not be equally effective in serving the State's compelling interests. Antietam at *34; Legacy Church, 2020 U.S. Dist. LEXIS 68415, at *122; Cassell, 2020 U.S. Dist. LEXIS 77512, * 31, 37 (N.D. Ill. May 3, 2020). These courts have found that even requiring social distancing measures at a large gathering would not achieve the same result as prohibiting the large gathering all together. See Antietam at *35; Cassell, 2020 U.S. Dist. LEXIS 77512, at *37.

Given that Ohio's orders plainly promote the substantial state interest in preventing the spread of COVID-19, the only remaining question under the First Amendment analysis is whether the orders allow for "alternative avenues" of expression. The answer is a resounding yes. If recent months have taught anything, it is that innovations in communication and shared experience know no bounds. There are myriad platforms and distribution channels by which Plaintiffs and like-minded people may connect and engage in musical expression.[9] See Benner v. Wolf, 2020 U.S. Dist. LEXIS 89425, at *19-21 (M.D. Pa. May 21, 2020) (gathering limitations "do not in any respect limit the ability to speak or assemble, however, as [they do] not in any respect prohibit operations by telephone, video-conferencing, or on-line through websites and otherwise. *In this era, cyberspace in general and social media in particular have become the lifeblood for the exercise of First Amendment rights*.") (quotation omitted; emphasis added).

In sum, because Ohio's temporary prohibition on festivals is a reasonable, content-neutral time, place and manner restriction aimed at achieving an important government interest— stopping the spread of COVID-19—that leaves open alternative avenues of expression, Plaintiffs lack a likelihood of success on their First Amendment claim.[10]

---

[9]    See, e.g., https://www.theverge.com/2020/4/23/21233946/travis-scott-fortnite-concert-astronomical-record-breaking-player-count (describing a concert held in April 2020 on the Fortnite gaming platform virtually attended by 12.3 million users); https://www.billboard.com/articles/columns/pop/9335531/coronavirus-quarantine-music-events-online-streams (compiling information regarding virtual concerts held during COVID-19 pandemic).

[10]    To the extent that Plaintiffs' First Amendment theories is premised upon a freedom of association theory as opposed to a freedom of expression theory, Plaintiffs' claim fares no better for the same reasons discussed above. See Givens, 2020 U.S. Dist. LEXIS 81760, at * 20-21 (prohibition on large gatherings did not violate the right to freedom of assembly because, again, the prohibition was unrelated to the suppression of expressive association and was narrowly tailored).

3. **Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On Their Equal Protection Clause.**

    a. **The State's Determination Of Which Activities Are Permitted To Resume And When During Ohio's Phased Re-Opening Is Subject To Rational Basis Review.**

Because Ohio is re-opening in phases, the state must distinguish between certain activities that it allows to resume before others. While businesses and activities within the same category are permitted to re-open at the same time, businesses and activities in different categories are being permitted to re-open on a staggered basis.

While Plaintiffs seem to be arguing that Ohio must take an all-or-nothing approach, the State is not required to do so. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." Dandridge v. Williams, 397 U.S. 471, 486-487 (1970). Chief Justice Roberts recognized this principle: "[t]he precise question of *when restrictions on particular social activities should be lifted* during the pandemic is a dynamic and fact-intensive matter" that "should not be subject to second-guessing…." South Bay, supra, 2020 U.S. LEXIS 3041, at *2-3 (emphasis added; quotation omitted).

The recent decision in Talleywhacker, Inc. v. Cooper, 2020 U.S. Dist. LEXIS 99905, at *25-26 (E.D.N.C. June 8, 2020), which is extensively discussed in the introduction, is on point. There the Court rejected the plaintiffs' Equal Protection claim challenging the state's phased re-opening orders following COVID-19 shutdowns. It specifically held:

    While plaintiffs effectively point out similarities between their businesses and those allowed to reopen, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. Indeed, [i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. … [D]efendant employed a '*dimmer switch*' approach to the reopening of businesses, *gradually easing restrictions on*

*high-risk activities, instead of allowing all businesses to reopen at once*, in order to monitor the spread of COVID-19. This measured approach *is reasonable and rational*, where uncertainties about COVID-19 still loom.

> [Id. at *28-29 (quotations, citations omitted; emphasis added).]

So, too, here, Ohio's decision to re-open using a "dimmer switch" approach—as opposed to opening all floodgates at once—survives rational basis scrutiny.  The Talleywhacker court's comments apply with equal force here: "At bottom, plaintiffs fail to account for defendant's need to consider a myriad of factors, sometimes in tension with each other, in balancing multiple public needs across the spectrum of the state economy and social fabric. The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement, not suitable for judicial second guessing."  Id. at *31 (quotation omitted).  As in Talleywhacker, Ohio's "measured approach is reasonable and rational."  Id.  Plaintiffs' Equal Protection claim, therefore, fails.

> **b.      Plaintiffs' Equal Protection Claim Fails Because Their Musical Festivals And Political Protests Against Police Brutality Are Not Similarly Situated.**

Given that Ohio's temporary prohibition on festivals is valid under rational basis review, Plaintiffs pivot and attempt to invoke a heightened standard of review by re-casting their Equal Protection claim as one involving "fundamental" First Amendment Rights.  At bottom, Plaintiffs' Equal Protection claim boils down to an argument that they should be allowed to put on their music festivals because the State did not silence Ohioans who protested police brutality in the wake of the death of George Floyd.  [Compl. ¶ 142-52, R. 1, PageID# 28-32.]  But Plaintiffs' efforts to evade the rational basis test fail for two straightforward reasons.

It is well-settled that Plaintiffs must establish, as a threshold matter for their Equal Protection claim, that they are similarly situated with the protestors of police brutality that they

claim are being treated preferentially. "A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'" Tree of Life Christian Schools v. City of Upper Arlington, 905 F. 3d 357, 368 (6th Cir. 2018); Aldridge v. City of Memphis, 404 F. App'x 29, 42 (6th Cir. 2010) (same). Where a plaintiff fails to establish the plaintiff is similarly situated with the comparator, the Equal Protection claim fails as a matter of law. Prado v. Thomas, 2020 U.S. App. LEXIS 5381, at *19 (6th Cir. Feb. 20, 2020) ("The threshold element of an equal protection claim is disparate treatment of similarly situated individuals.… Prado has not met that threshold. Her equal protection claim fails as a matter of law.") (quotation, citation omitted); Jolivette v. Husted, 694 F. 3d 760, 771 (6th Cir.2012) ("Jolivette's equal-protection claims do not get off the ground because independent candidates and partisan candidates are not similarly situated for purposes of election regulations.").

This threshold requirement stems from the principle that "it is not a violation of the equal protection clause to treat different people differently." Earle v. Birmingham Bd. of Edn., 2020 U.S. Dist. LEXIS 14629, at *23 (N.D. Ala. Jan. 29, 2020). Indeed, "[t]reating *different* cases differently is not discriminatory, let alone intentionally so." Lewis v. City of Union City, 918 F. 3d 1213, 1222-1223 (11th Cir.2019) (emphasis in original). As a sister Court in this Circuit put it, "the Constitution does not require things which are different in fact to be treated in law as though they were the same." Charlevoix Prods., Inc. v. Cty. of Charlevoix, 1990 U.S. Dist. LEXIS 11020, at *4-6 (W.D. Mich. Aug. 20, 1990).

But here, Plaintiffs' Equal Protection theory hinges upon comparing apples and oranges. Equus Assocs. v. Town of Southampton, 37 F. Supp. 2d 582, 599 (E.D.N.Y. 1999) (Equal Protection claim failed as a matter of law where plaintiff was "contrasting apples with oranges."); High Plains Harvest Church v. Polis, 2020 U.S. Dist. LEXIS 105247

(D.Colo. June 16, 2020) (denying TRO that asserted state unconstitutionally prohibited religious services while permitting police brutality protests); Charlevoix Prods., Inc. v. Cty. of Charlevoix, 1990 U.S. Dist. LEXIS 11020, at *4-6 (W.D. Mich. Aug. 20, 1990) (rejecting outdoor festival venue's Equal Protection challenge to mass gathering ordinance because outdoor festivals are not similarly situated with ski resort that was not subject to ordinance).

The differences between festivals and political protests are obvious. One is pure speech; the other includes but is clearly not limited to speech. Plaintiffs seek to hold an organized commercial event requiring significant planning that brings tens of thousands of people together from outside the local area to congregate in close proximity for three straight days. Unlike protestors, attendees of Plaintiffs' festivals would be *living together* for multiple days and would be engaging in non-speech activities—such as selling food and merchandise, eating, toileting, showering, and camping—all while consuming alcohol and engaging in other activities that reduce the likelihood that attendees would maintain social distancing best practices. The outbreaks of COVID-19 on cruise ships highlights the fundamental distinction between an activity in which a large number of strangers come together and live together, and an activity where they do not.

At bottom, because festivals and political protests are fundamentally different, the State may regulate these activities differently without offending Equal Protection. Plaintiffs' Equal Protection claim fails for this reason alone.

c. **Plaintiffs' "Fundamental Rights" Argument Is A Red Herring; Content-Neutral Regulations Are Reviewed Under The Rational Basis Test.**

Even if Plaintiffs' could establish that they were similarly situated with political protestors, their Equal Protection claim fails because Ohio's temporary prohibition on festivals is

content-neutral. While Plaintiffs may assert that speech and expression are fundamental rights, that does not change the level of Equal Protection scrutiny applied to a content-neutral restriction. Where the challenged law is content-neutral, "the Equal Protection Clause adds nothing to the First Amendment analysis; if a sufficient rationale exists for the [law] under the First Amendment, then … a rational basis [exists] for the alleged disparate treatment under the Equal Protection Clause." DLS, Inc. v. City of Chattanooga, 107 F. 3d 403, 411 fn. 7 (6th Cir.1997). Stated differently, "strict scrutiny under the Equal Protection Clause is inappropriate where a law regulating speech is content-neutral, even where the speech at issue was non-commercial." Maldonado v. Morales, 556 F. 3d 1037, 1048 (9th Cir.2009).[11]

In other words, a plaintiff cannot resuscitate a failed First Amendment challenge to a content-neutral restriction by asserting an Equal Protection claim:

> From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction…. But where the state shows a satisfactory rationale for a *content-neutral* time, place, and manner regulation, *that regulation necessarily passes the rational basis test employed under the Equal Protection Clause*…. So it is here: the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment.
>
> [McGuire v. Reilly, 260 F. 3d 36, 49-50 (1st Cir. 2001) (citations omitted, emphasis added).]

So it is here, as well. Ohio's temporary restriction on festivals is content-neutral—it applies regardless of the content of any expression that might occur at a festival and is justified

---

[11]  Accord: Kaahumanu v. Hawaii, 682 F. 3d 789, 810 (9th Cir.2012) (even though the right to marry is a fundamental right, regulation's disparate treatment of commercial and non-commercial weddings was subject to rational basis review for purposes of Equal Protection claim); Taxi Cabvertising, Inc. v. City of Myrtle Beach, 26 F.App'x 206, 208 (4th Cir.2002) (rejecting Equal Protection claim: "Because Ordinance 98-21 is content-neutral, strict scrutiny does not apply."); Marcavage v. City of New York, 918 F. Supp. 2d 266, 275 (S.D.N.Y. 2013) (content-neutral permitting system on amplified speech was subject to rational basis review under the Equal Protection Clause because it did not interfere with a fundamental right); Automaxx, Inc. v. Morales, 906 F. Supp. 394, 402 (S.D.Tex.1995) (rational basis review applied to Equal Protection challenge to statute that only incidentally impacted speech); Banks v. Cty. of San Mateo, 2017 U.S. Dist. LEXIS 127347, at *39 (N.D.Cal. Aug. 10, 2017) ("Equal Protection claim based on a First Amendment violation cannot be sustained" where "everyone, regardless of the views they wish to express, is treated similarly").

without reference to speech.  <u>Antietam Battlefield KOA</u>, <u>supra</u>, 2020 U.S. Dist. LEXIS 88883, at *26-27.  As such, Plaintiffs' Equal Protection theory fails for the same reasons their First Amendment theory fails.

> **4. Plaintiffs Cannot Prove By Clear And Convincing Evidence A <u>Likelihood Of Success On Their Substantive Due Process Claim.</u>**

Plaintiffs next assert a substantive due process claim, and their Complaint and motion contain several references to a variety of rights, including general liberty and freedom of movement, and freedom of association with others.  Only brief comment is required inasmuch as no such claim exists for Plaintiffs' alleged grievances.

Several hornbook propositions of law make this clear.  First, substantive due process claims are strictly circumscribed and are limited to protecting fundamental liberty interests, such as marriage, procreation, contraception, and a person's bodily integrity.  <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 272 (1994). A substantive due process does not "offer recourse for every wrongful action taken by the government."  <u>EJS Props., LLC v. City of Toledo</u>, 698 F. 3d 845, 862 (6th Cir. 2012).  Such interests are not implicated here.

Second, no substantive due process claim is available where a specific constitutional provision "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more *generalized* notion of substantive due process, must be the guide for analyzing these claims."  <u>Albright</u>, 510 U.S. at 273 (citation omitted).  In <u>Albright</u>, for example, the petitioner complained of an unlawful search and seizure, and the Supreme Court held that the Fourth Amendment was the "explicit textual source" of petitioner's protection and that the petitioner did not have a substantive due process claim for the alleged unlawful seizure.  <u>See</u> <u>also</u> <u>Kiser v. Kamdar</u>, 831 F. 3d 784, 791 (6th Cir. 2016) (affirming dismissal of substantive due process claim based on alleged infringement of plaintiff's

commercial-speech rights, holding "this case is properly framed as a commercial-speech case, rather than an economic-liberty case").  Heike v. Guevara, 519 Fed. Appx. 911, 923 (6th Cir. 2013) (affirming dismissal of substantive due process claim, holding plaintiff's allegation that defendants "wrongfully declined to renew her scholarship, based either on her race or on her gender" must be resolved solely under the Equal Protection Clause).  Here, the Equal Protection Clause or the First Amendment provide a textual basis for challenging the State's conduct. The fact that Plaintiffs lack a viable claim under either theory does not allow them to advance an alternative substantive due process claim.

Finally, substantive due process claims are limited to "intentional and reckless efforts" by public officials to violate fundamental liberty interests, whereas "[n]egligent, even grossly negligent, conduct [by officials] does not generally violate citizens' substantive due process rights." Guertin v. Mich., 924 F. 3d 309, 311 (6th Cir. 2019) (denying en banc review) (Sutton, J., concurring).  "The test … [is] whether the defendant official 'intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow.' " Lewellen v. Metro. Gov't of Nashville & Davidson County, Tenn., 34 F. 3d 345, 349 (6th Cir. 1993).  This requires Plaintiffs to prove "a something that we have variously described as 'callous[ ] disregard [for] the risk of injury' or action 'in an arbitrary manner that "shocks the conscience" or that indicates an[ ] intent to injure.' " Schroder v. City of Fort Thomas, 412 F. 3d 724, 730 (6th Cir. 2005). "That additional element – be it termed callous disregard or intent to injure – ensures that 'only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." ' " Id.  Again, no such evidence exists to support such a claim.

**5.**     **Plaintiffs Cannot Prove By Clear And Convincing Evidence A Likelihood Of Success On Their Facial Constitutional Claim.**

Finally, Plaintiffs purport to offer a facial challenge to the constitutionality of the Public Health Orders—they contend they are facially invalid and should be stricken does in their entirety.   Such claim lacks any basis in fact or law.   As observed by the Supreme Court, a "facial challenge to an [statute or order] … is the most difficult challenge to mount successfully" and will only succeed if a litigant can "establish that no set of circumstances exists under which the [statute or order] would be valid."   United States. v. Salerno, 481 U.S. 739, 745 (1987).

As the Supreme Court has observed, "[f]acial challenges are disfavored for several reasons."   Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450-451 (2008).   Since they "often rest on speculation," "they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'"   Id. (quoting Sabri v. United States, 541 U.S. 600, 609 (2004).   Facial challenges also "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"   Id. (quoting Ashwander v. TVA, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring).

Perhaps most important, facial challenges are inherently anti-democratic: "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Id. After all, "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."   Id. (quoting Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 329 (2006)).   Here, it cannot be credibly suggested that there is not a single circumstance in which the Public Health Orders cannot be constitutionally applied.   The fact that dozens of courts

from across the country approve these very type of public health orders in the COVID-19 contexts forecloses any reasoned challenge.

**B.    The Other Injunction Factors Weigh Against Injunctive Relief.**

"[A] finding that there is simply no likelihood of success on the merits is usually fatal to a plaintiff's quest for a preliminary injunction." Enchant Christmas Light Maze & Mkt. v. Glowco, LLC, 958 F. 3d 532, 539 (6th Cir. 2020) (quotation omitted). Nonetheless, we briefly turn to the remaining injunction factors.

**1.    Plaintiffs Do Not Face Irreparable Harm; Their Claims Are Fundamentally About Money.**

Where "the real harm" a plaintiff seeks to avoid the loss of money, the "general rule is that 'a plaintiff's harm is not irreparable if it is fully compensable by money damages.' " Nat'l Viatical Inc., v. Universal Settlements, Int'l, 716 F. 3d 952, 957 (6th Cir. 2013) (affirming denial of preliminary injunction). Accord: Brieger v. Telectronics, Inc., 816 F.2d 678 (Table), 1987 U.S. App. LEXIS 5101, at *3 (6th Cir. 1987) (affirming denial of injunctive relief, court held "an economic injury – lost business … is just the sort of injury that the remedy of money damages is well suited to redress"). This general rule is fully applicable where injunctive relief is sought on constitutional claims. In Aristotle Publ'g v. Brown, 61 Fed. Appx. 186 (6th Cir. 2003), for example, the Sixth Circuit held that a business that brought a claim for civil-rights violation "failed to demonstrate that it will be irreparably harmed absent an injunction" because "[i]t appears that the only harm [it] will suffer is financial in nature. This Court has made clear, however, that 'potential monetary damage does not constitute irreparable harm.' " Id. at 188 (citing Baker v. Adams County v. Ohio Valley Sch. Bd., 310 F. 3d 927, 930 (6th Cir. 2002)). Stated another way, "where the injury is purely economic in nature, a preliminary injunction is not necessary." Bonnell v. Lorenzo, 241 F. 3d 800, 925 (6th Cir. 2001) (holding where plaintiff's

claimed harm from alleged First Amendment violation was lost income, his harm was compensable with monetary damages).

Here, Plaintiffs' claims are fundamentally about money—the amount they have invested into planning their music festivals and the amount they stand to lose if not permitted to proceed. Plaintiffs' potential monetary damage does not constitute irreparable harm.

> **2. The Harm To The Parties And The Public Interest Weigh Against Injunctive Relief.**

The context of this lawsuit cannot be overstated—there is an ongoing pandemic causing death over the entire planet. ODH has issued orders with the intent of protecting the lives of Ohioans. Chief Judge Marbley's reasoning from a related challenge to ODH's orders applies here with equal force:

> While the immediacy and irreparability of harm to Plaintiffs is speculative, the harm to the public if the Director's order is enjoined is potentially catastrophic. The World Health Organization has declared COVID-19 to be a pandemic, and both the Governor of Ohio and the President have declared a state of emergency due to the rapid and exponential spread of the virus.... Furthermore, the mitigating measures in Director Acton's Stay at Home Order have helped to decrease the spread of the virus. As a result of aggressive mitigation efforts, Ohio has fewer COVID-19 cases than neighboring states with comparable populations…. As indicated in Defendant's brief, COVID-19 is a new disease that results in hospitalization for approximately 29% of those who contract the virus, and death in approximately 4% of confirmed cases. If the Director's Order is enjoined, *it is not merely livelihoods, but lives that would be put at risk, and the State has an interest in public health and the safety of its citizens*.
>
> > [Hartman v. Acton, 2020 U.S. Dist. LEXIS 72068, *34-35 (S.D. Ohio 2020) (emphasis added).]

**IV.**                                              **CONCLUSION**

For these many reasons, Plaintiffs' request for injunctive relief should be denied.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ Marion H. Little, Jr.
John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
SPECIAL COUNSEL
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Telephone:  614-365-9900
Facsimile:  614-365-7900
zeiger@litohio.com
little@litohio.com

*Counsel for Defendants*
*Amy Acton and Lance D. Himes*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 22, 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)

1230-001:862168